COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-03-228-CV
 
 
G.L. 
HARRIS                                                                                   
APPELLANT
AND 
APPELLEE
 
V.
 
AMERICAN 
PROTECTION                                                                    
APPELLEE
INSURANCE 
COMPANY                                                            
AND APPELLANT
 
 
------------
 
FROM 
THE 236TH DISTRICT COURT OF TARRANT COUNTY
 
------------
 
OPINION
 
------------
Introduction
        This 
case arises from two insurance claims for successive casualty losses to the roof 
of a shopping mall.  In six issues, appellant G.L. Harris asserts that the 
trial court erred by rendering a take nothing judgment against him because he 
proved his hail damage breach of contract and articles 21.55 and 21.21 claims as 
a matter of law, the trial court erred by refusing to submit his requested jury 
question on breach of contract, and the jury’s failure to find that American 
violated article 21.21 and its finding that Harris’s negligence caused his 
damages were against the great weight and preponderance of the evidence.  
In a sole issue on cross-appeal, American asserts that the trial court erred in 
granting a directed verdict against it on its fraud counterclaim.  We will 
affirm.
Background Facts
        On 
May 5, 1995, a severe hail storm damaged the roof of a vacant building known as 
Westridge Mall. At the time, the shopping mall was covered by two insurance 
policies, one issued by appellee American Protection Insurance Company 
(“American”) and the other by Aetna Life & Casualty (“Aetna”). Each 
policy effectively covered fifty percent of the loss[1] 
and named Southwest Portfolio (“Southwest”) as the insured.  On 
September 6, 1995, roofing contractor Gary Boyd discovered the hail damage 
during a warranty-related roof inspection.  Southwest made a claim for the 
hail damage under the Aetna policy on October 6, 1995. Because it was unaware of 
the American policy, Aetna agreed to cover one hundred percent of the loss and 
settled the claim for $712,612.50.[2]  In 
accordance with the settlement agreement, Aetna paid Southwest $268,445 for the 
actual cash value of the loss (“ACV”) and retained $444,167.50 as the 
replacement cost holdback, which would be paid out as repair costs were 
incurred.
        Meanwhile, 
the insurance broker who had sold both insurance policies to Southwest notified 
American of the claim. American sent a written claim acknowledgment to the 
broker and Aetna and assigned the file to American adjuster Dana McDade.  
McDade contacted Aetna’s adjuster, who asked American to reimburse Aetna for 
half of the ACV it had paid to Southwest.  American complied after McDade 
inspected the roof, reviewed documentation relied upon by Aetna’s adjuster, 
and talked with Aetna’s adjuster, construction consultants, and Southwest 
representatives.  Southwest representative Jeff Landel told McDade that the 
claim had already been settled with Aetna, and advised him to “stay out of 
it” and not do “anything that muddies up the stream” on the pending sale 
of the property to Harris.  Landel also expressly declined to make a claim 
with American and instructed McDade to resolve American’s liability for the 
claim directly with Aetna.
        After 
Southwest received the ACV payment and before any repairs were made to the roof, 
Southwest sold the building to Harris.  The purchase and sale agreement 
assigned to Harris “any assignable rights to the insurance claim paid or 
payable as a result of the hail damage to the roof of the Project occurring on 
or about May 5, 1995.”  Pursuant to this agreement, Harris was credited 
at closing with $268,445, the amount of the ACV payment.
        The 
settled claim assigned to Harris was based on an approved proposal from Boyd, 
the roofing contractor who discovered the damage.  Boyd proposed 
perforating the existing roof and installing a new recovery board and rubber 
roof.  Instead of hiring Boyd to do the repairs, Harris entered into a 
contract with Mike Wright under which Wright agreed to perforate the existing 
roof and install a recovery board and modified bitumen roof, ostensibly for 
$690,000.  Wright replaced the roof without installing the promised 
recovery board.
        Harris 
represented to Aetna that he had incurred $690,000 in replacement costs, and 
Aetna released payments to cover those costs, minus the prior ACV payment and 
the $25,000 policy deductible. Aetna, in turn, asked American to reimburse it 
for half of the replacement costs.  American did not immediately reimburse 
Aetna for these costs because it recognized it was in uncharted legal territory.  
American questioned its liability for the replacement costs because Aetna had 
paid the money to Harris rather than American’s named insured, Southwest, and 
American had never authorized Southwest’s assignment of the policy benefits to 
Harris. Despite its misgivings, American ultimately reimbursed Aetna for half of 
the replacement costs.
        In 
total, Harris received $680,260 for the hail damage claim, and American 
reimbursed Aetna for half of that amount.  Further, although Harris 
represented to Aetna that he had paid Wright $690,000 to replace the roof, he 
had actually paid only $375,000.
        On 
February 12, 1997, private adjuster Steve Mayor filed a supplemental proof of 
loss with Aetna on behalf of Harris, claiming a loss of over $1.8 million 
allegedly caused by Wright’s faulty roof replacement.  Aetna rejected the 
claim and forwarded the statement of loss to American on March 10, 1997.  
American contacted Mayor and asked for a copy of his scope of loss, but did 
nothing further when Mayor failed to provide the requested information.
Procedural History
        Harris 
filed suit against Aetna on March 19, 1997.  After Aetna filed a plea in 
abatement claiming that American was a necessary party, Harris amended his 
petition to add American as a defendant. Harris alleged that American had 
breached its insurance contract by failing to pay policy benefits and that it 
had violated article 21.55 and section 4(10) of article 21.21 of the insurance 
code.  See Tex. Ins. Code 
Ann. art. 21.55, art. 21.21, § 4(10) (Vernon Supp. 2004-05).  
American filed a counterclaim against Harris for fraud after Wright’s 
deposition testimony brought Harris’s repair cost misrepresentation to light.  
Aetna settled with Harris before trial.
        The 
suit between Harris and American was tried before a jury.  The trial court 
disposed of the fraud counterclaim by granting a directed verdict against 
American on that issue.  The jury returned a verdict finding that American 
had not violated article 21.21 and that Harris’s negligence had caused his 
damages.[3]  The trial court then entered a take 
nothing judgment against Harris.
Breach of Contract
        In 
his second and third issues, Harris contends that the trial court erred in 
rendering a take nothing judgment against him because he proved as a matter of 
law that American owed him $175,000 for his hail damage claim under the terms of 
its policy.  American argues that Harris failed to preserve this issue for 
appeal, or, alternatively, that American has discharged its liability and Harris 
has been fully compensated for the hail damage claim.
        Harris 
preserved this issue for appeal by moving for an instructed verdict on his 
article 21.55 claim at the close of evidence.  See T.O. Stanley Boot Co. 
v. Bank of El Paso, 847 S.W.2d 218, 220-21 (Tex. 1992) (holding that party 
may preserve complaint that liability was established as a matter of law by 
filing motion for instructed verdict).  Harris’s article 21.55 claim was 
based on American’s alleged mishandling of both the hail damage and 
supplemental claims.  An article 21.55 claim combines an insurer’s 
contractual and statutory liability into one cause of action.  Lusk v. 
Puryear, 896 S.W.2d 377, 380 (Tex. App.—Amarillo 1995, no writ).  To 
recover the statutory penalties available under article 21.55, an insured must 
first prove that the insurer is liable for the underlying claim.  Mid-Century 
Ins. Co. of Tex. v. Barclay, 880 S.W.2d 807, 811 (Tex. App.—Austin 1994, 
writ denied).  Therefore, Harris’s claim that American was contractually 
obligated to pay him half of the hail damage claim was subsumed within the hail 
damage portion of his article 21.55 claim and preserved by his motion for an 
instructed verdict on that claim.
        Turning 
to the merits of the issue, Harris contends that he proved as a matter of law 
that American owes him $175,000[4] for the hail damage 
claim.  American did not dispute below that it was liable for half of the 
hail damage claim, and American witness Ed Cass agreed that $175,000 accurately 
reflected the true amount of that liability.[5] American 
argues, however, that it more than satisfied its liability for the hail damage 
claim by paying Aetna $340,130 because Aetna became subrogated to Harris’s 
right to recover fifty percent of his loss from American when Aetna paid one 
hundred percent of the hail damage claim.   American also argues that 
if Harris receives any additional benefits for the hail damage claim, they will 
constitute an impermissible double recovery.  We agree.
        When 
two insurers have contracted to pay a loss and each insurer’s policy contains 
a pro rata clause, each insurer is liable to the insured only for its proportion 
of the loss.[6]  Employers Cas. v. Transp. 
Ins. Co., 444 S.W.2d 606, 608 (Tex. 1969); United States Fire Ins. Co. v. 
Stricklin, 556 S.W.2d 575, 578 (Tex. Civ. App.—Dallas 1977), writ 
ref’d n.r.e., 565 S.W.2d 43 (Tex. 1978) (per curiam).  In that 
situation, the pro rata clause implements the principle of indemnity and 
eliminates the potential for a double recovery that would otherwise exist.  
State Farm Fire & Cas. Co. v. Griffin, 888 S.W.2d 150, 156 (Tex. 
App.—Houston [1st Dist.] 1994, no writ).  Further, if an insurer overpays 
its share of a loss, the correct manner of adjusting for that overpayment is for 
the insurer to assert a contractual or equitable right of subrogation.  Employer’s 
Cas. Co., 444 S.W.2d at 610; Gen. Agents Ins. Co. of Am., Inc. v. Home 
Ins. Co. of Ill., 21 S.W.3d 419, 424 (Tex. App.—San Antonio 2000, no 
pet.).  Whether the overpayment was voluntary is immaterial for purposes of 
the subrogation claim.  See Employer’s Cas. Co., 444 S.W.2d 
at 610; Gen. Agents Ins. Co. of Am., Inc. 21 S.W.3d at 424.
        Subrogation 
is the principle under which an insurer that has paid a loss under an insurance 
policy is entitled to all the rights and remedies belonging to the insured 
against a third party with respect to any loss covered by the policy.  Black’s Law Dictionary 1467 (8th ed. 
2004).  Application of the doctrine is said to be “the purest of 
equities,” and Texas courts are particularly hospitable to it.  Interfirst 
Bank Dallas, N.A. v. U.S. Fidelity & Guar. Co., 774 S.W.2d 391, 397 
(Tex. App.—Dallas 1989, writ denied).  Equitable subrogation is not 
dependent upon contract, but arises by operation of law or by implication in 
equity to prevent injustice.  Id.
        In 
this case, the Aetna policy contains a contractual subrogation provision that 
provides, in pertinent part, “[I]f any person or organization to or for whom 
we make payment under this policy had rights to recover damages from another, 
those rights are transferred to us to the extent of our payment.”  Thus, 
when Aetna paid the entire hail damage claim to Harris, it became equitably and 
contractually subrogated to Harris’s right to recover fifty percent of the 
loss from American.  Therefore, American discharged its liability to Harris 
by paying its half of the hail damage claim to Aetna.  Moreover, Harris is 
not entitled to receive any additional money for the hail damage claim because 
the loss was fully compensated by Aetna.  See Hochheim Prairie Farm Mut. 
Ins. Ass’n v. Campion, 581 S.W.2d 254, 257 (Tex. Civ. App.—Corpus 
Christi 1979, writ ref’d n.r.e.) (holding that insureds would be unjustly 
enriched if they were allowed to recover for the portion of a loss that had 
already been compensated by a third party).
        Harris 
also contends that the trial court erred by failing to include his breach of 
contract questions[7] in the jury charge.  To 
resolve this issue, we must examine the record to determine if there is any 
probative evidence to support the elements of Harris’s hail damage breach of 
contract claim.  See Am. Home Assurance Co. v. Brandt, 778 S.W.2d 
141, 144 (Tex. App.—Texarkana 1989, writ denied).  If there was some 
evidence to support it, the trial court should have submitted a breach of 
contract question on the hail damage claim. Moore v. Lillebo, 722 S.W.2d 
683, 686-87 (Tex. 1986).
        The 
elements of a breach of contract claim are (1) the existence of a valid 
contract, (2) performance or tendered performance by the plaintiff, (3) breach 
of the contract by the defendant, and (4) damages to the plaintiff resulting 
from that breach.  Adams v. H & H Meat Prods., Inc., 41 S.W.3d 
762, 771 (Tex. App.—Corpus Christi 2001, no pet.); Frost Nat’l Bank v. 
Burge, 29 S.W.3d 580, 593 (Tex. App.—Houston [14th Dist.] 2000, no pet.).  
Considering only the evidence and the inferences tending to support Harris’s 
breach of contract claim and disregarding all evidence and inferences to the 
contrary, see Moore, 722 S.W.2d at 687, we hold that Harris failed to 
produce evidence to support the submission of his breach of contract questions 
regarding the hail damage claim to the jury.  Although there is some 
evidence that American was contractually liable for half of the hail damage 
claim, there is no evidence that American breached that obligation or that 
Harris suffered any damages.  To the contrary, Harris received more than he 
was entitled to under either insurance policy.  Because there is no 
evidence to support Harris’s requested breach of contract questions regarding 
the hail damage claim, the trial court did not err in refusing to submit them.  
S.W. Bell Tel. Co. v. Thomas, 554 S.W.2d 672, 674 (Tex. 1977).  
Accordingly, we overrule Harris’s second and third issues.
Article 21.55
        In 
his fourth issue, Harris contends that the trial court erred in denying his 
motion for a directed verdict because he proved his article 21.55 claim with 
respect to the hail damage as a matter of law.
        Article 
21.55 of the insurance code is intended to ensure prompt payment of insurance 
claims.  Mid-Century Ins. Co., 880 S.W.2d at 812.  It specifies 
particular time periods during which an insurer must act on claims, Bekins 
Moving & Storage Co. v. Williams, 947 S.W.2d 568, 581 (Tex. 
App.—Texarkana 1997, no pet.), and “requires the prompt payment or 
resolution of claims according to a defined timetable,” DeLeon v. Lloyd’s 
London Certain Underwriters, 259 F.3d 344, 354 (5th Cir. 2001).[8]  An insurer will not be held liable for violating 
article 21.55 unless it is found liable for the underlying insurance claim.  
Mid-Century Ins. Co., 880 S.W.2d at 811; see also Cater v. United Svcs. 
Auto. Ass’n, 27 S.W.3d 81, 84 (Tex. App.—San Antonio 2003, pet. denied) 
(holding that an insurance company’s good faith defense does not relieve the 
insurer from liability for damages for late payment, as long as the insurer is 
finally found liable for the claim).  Because Harris failed to prove that 
American was liable to him for the hail damage claim, we hold that the trial 
court did not err in denying Harris’s motion for a directed verdict on his 
article 21.55 claim.  We overrule Harris’s fourth issue.
Article 21.21
        In 
his fifth issue, Harris contends that the trial court erred in not granting his 
motion for a directed verdict because he proved his article 21.21 claim as a 
matter of law.  Specifically, he argues that the evidence conclusively 
establishes that American violated article 21.21 by failing to confirm or deny 
its coverage of the hail damage and supplemental claims within a reasonable time 
and failing to attempt in good faith to effectuate prompt, fair, and equitable 
settlements of those claims.  Alternatively, he argues that the jury’s 
failure to make such findings is against the great weight and preponderance of 
the evidence.
        If 
an appellant is attacking the legal sufficiency of an adverse answer to an issue 
on which he had the burden of proof, the appellant must overcome two hurdles.  
Victoria Bank & Trust Co. v. Brady, 811 S.W.2d 931, 940 (Tex. 1991).  
First, the record must be examined for evidence that supports the finding, while 
ignoring all evidence to the contrary.  Second, if there is no evidence to 
support the finding, then the entire record must be examined to see if the 
contrary proposition is established as a matter of law.  Dow Chem. Co. 
v. Francis, 46 S.W.3d 237, 241 (Tex. 2001); Sterner v. Marathon Oil Co., 
767 S.W.2d 686, 690 (Tex. 1989).  The issue should be sustained only if the 
contrary position is conclusively established.  Dow Chem. Co., 46 
S.W.3d at 241-42.
        In 
reviewing an issue asserting that an answer is “against the great weight and 
preponderance” of the evidence, we must consider and weigh all of the 
evidence, both the evidence that tends to prove the existence of a vital fact as 
well as evidence that tends to disprove its existence.  Ames v. Ames, 
776 S.W.2d 154, 158-59 (Tex. 1989), cert. denied, 494 U.S. 1080 (1990); Cain 
v. Bain, 709 S.W.2d 175, 176 (Tex. 1986).  If a finding is so contrary 
to the great weight and preponderance of the evidence that it is manifestly 
unjust, the issue should be sustained, regardless of whether there is some 
evidence to support it.  Kissinger v. Turner, 727 S.W.2d 750, 752 
(Tex. App.—Fort Worth 1987, writ ref’d n.r.e.); Watson v. Prewitt, 
159 Tex. 305, 320 S.W.2d 815, 816 (1959).
        Article 
21.21 of the insurance code prohibits insurers from, among other unfair 
settlement practices, failing to affirm or deny coverage of a claim to a policy 
holder within a reasonable time and failing to attempt in good faith to 
effectuate a prompt, fair, and equitable settlement of a claim with respect to 
which an insurer’s liability has become reasonably clear.  Tex. Ins. Code Ann. art. 21.21, § 4(10) 
(Vernon Supp. 2004-05).[9]  We employ an 
objective standard to determine whether a reasonable insurer under similar 
circumstances would have delayed or denied payment of the claim.  Aranda 
v. Ins. Co. of N. Am., 748 S.W.2d 210, 213 (Tex.1988); Vandeventer v. All 
Am. Life & Cas. Co., 101 S.W.3d 703, 722 (Tex. App.—Fort Worth 2003, 
no pet.).  An insurer will be liable if the insurer knew or should have 
known that it was reasonably clear that the claim was covered.  Universe 
Life Ins. Co. v. Giles, 950 S.W.2d at 56; Vandeventer, 101 S.W.3d at 
722.  Evidence that merely shows a bona fide dispute about the insurer’s 
liability on the contract does not rise to the level of bad faith.  Provident 
Am. Ins. Co. v. Castaneda, 988 S.W.2d 189, 193 (Tex. 1998); Covington v. 
Travelers Indem. Co. of R.I./Conn., 122 S.W.3d 330, 333 (Tex. App.—Fort 
Worth 2003, no pet.).
        Harris 
argues that American’s failure to independently adjust the hail damage and 
supplemental claims constituted both a failure to confirm or deny coverage and a 
failure to effectuate prompt and reasonable settlements of those claims.  
We disagree.
        With 
respect to the hail damage claim, the record shows that neither Southwest nor 
Harris made a claim for hail damage under the American policy.  In fact, 
Southwest deliberately settled the hail damage claim exclusively with Aetna, 
expressly declined to make a claim with American, and instructed American to 
settle its liability directly with Aetna.  American appropriately confirmed 
its coverage of the hail damage claim to Aetna, rather than the insured, because 
Aetna asked American to pay for its share of the claim and was entitled to 
receive payment from American through its subrogation rights.  The record 
simply does not support Harris’s contention that American violated article 
21.21 by failing to confirm or deny coverage of the hail damage claim.
        The 
record similarly fails to support Harris’s claim that American failed to 
effectuate a prompt, reasonable settlement of the hail damage claim.  The 
record clearly shows that soon after receiving notice of the hail damage, 
American adjuster McDade contacted Aetna, inspected the roof, reviewed 
documentation relied upon by Aetna’s adjuster, and talked with Aetna’s 
adjuster and construction consultants and Southwest’s representatives.  
American promptly acknowledged its liability and reimbursed Aetna for half of 
the ACV.  It undertook additional fact gathering when Aetna requested 
reimbursement for the replacement cost and subsequently settled the remainder of 
the hail damage claim with Aetna. Because the insured instructed American to 
settle its liability with Aetna and because Aetna was entitled to receive the 
benefits payable under the American policy for the hail damage claim, we hold 
that American’s actions vis a vis Aetna satisfied its duty to effectuate a 
prompt and reasonable settlement of the hail damage claim.
        Turning 
to the supplemental claim, Harris complains that American’s inaction following 
its initial review of the proof of loss and unmet request for a copy of the 
scope of loss violated article 21.21.  An insurer has a duty to confirm or 
deny coverage of a claim to a policy holder only.  See Tex. Ins. Code Ann. art. 21.21, § 
4(10)(v)(A).  Southwest was the named insured on the American policy.  
When Harris purchased the building from Southwest, he received an assignment of 
the benefits paid or payable as a result of the hail damage claim.  The 
supplemental claim is separate from the hail damage claim because it is based on 
the loss caused by Wright’s faulty roof replacement rather than the hail 
storm.  The purchase and sale agreement does not purport to assign to 
Harris the right to receive benefits under Southwest’s insurance policies for 
future claims.
        Moreover, 
the purchase and sale agreement carefully qualifies the rights being assigned to 
Harris as “those that are assignable without consent of third parties.”  
This language cannot be given meaning without looking outside the agreement to 
the insurance policy under which Harris claimed coverage.  The American 
policy states that “the rights to benefits herein contained are not assignable 
without American’s written consent.”  Examining the record for evidence 
of American’s consent, we instead find a letter in which American expressly 
withheld its approval of the proposed assignment of the hail damage claim.  
Because Harris failed to prove that he was an American policyholder, he did not 
establish that American had a duty to him to confirm or deny its liability for 
the supplemental claim.[10]
        Harris 
also failed to show that American failed to attempt in good faith to effectuate 
a prompt, fair, and equitable settlement of the supplemental claim.  The 
evidence does not establish that American lacked a reasonable basis for denying 
or delaying payment of the supplemental claim.  An insurer does not have an 
obligation to attempt in good faith to effectuate a prompt, fair, and equitable 
settlement of a claim unless its liability for that claim has become reasonably 
certain.  Id. § 4(10).  The record contains ample evidence 
that American’s liability for the supplemental claim never became reasonably 
certain.  As discussed above, American had good reason to doubt that 
Southwest’s assignment to Harris of the benefits paid or payable for the hail 
damage claim imposed liability on American for the supplemental claim.  In 
addition, the American policy contained “faulty-workmanship”[11] and “60-day vacancy”[12] 
exclusions that cast further doubt upon American’s liability.  And the 
American policy appears to have expired before the supplemental claim was made.[13] Because Harris did not show that a reasonable insurer 
would have paid the supplemental claim under these facts, he did not establish 
that American lacked a reasonable basis for delaying or denying payment of the 
supplemental claim.
        Moreover, 
even if American did violate article 21.21, Harris did not plead or prove any 
damages that are recoverable under that statute.  A plaintiff who prevails 
on an article 21.21 claim may recover the greatest amount of actual damages 
alleged and factually established to have been caused by the unfair or deceptive 
practice.  Provident Am. Ins. Co. v. Castenada, 988 S.W.2d 189, 199 
(Tex. 1998).  Harris sought $175,000 for American’s handling of the hail 
damage claim and $733,613 for its handling of the supplemental claim. Harris’s 
request for damages related to the hail damage claim is baseless because he has 
already recovered more than the amount of his loss from the hail damage.  
The supplemental claim damages merely represent the alleged cost of replacing 
the roof a second time.  Harris did not prove that American’s handling of 
the supplemental claim caused the roof damage that necessitates such repairs; 
therefore, he did not establish article 21.21 damages.  See id.
        Because 
Harris did not prove his article 21.21 claim as a matter of law, we hold that 
the trial court did not abuse its discretion in refusing to grant a directed 
verdict on that claim.  See Dow Chem. Co., 46 S.W.3d at 241-42.  
Further, having reviewed all the evidence, we conclude that evidence supporting 
the finding that American did not violate article 21.21 by failing to confirm or 
deny coverage or attempt in good faith to effectuate a prompt, fair, and 
equitable settlement of the hail damage and supplemental claims is not so weak 
or the evidence to the contrary so overwhelming as to require that the jury’s 
verdict on the article 21.21 claim be set aside.  See Kissinger, 727 
S.W.2d at 752; Watson, 320 S.W.2d at 816.  Accordingly, we overrule 
Harris’s fifth issue.
Jury’s Negligence Finding
        In 
his sixth and final issue, Harris contends that the jury’s finding of his 
negligence is against the great weight and preponderance of the evidence.  
The jury found that Harris’s negligence was the proximate cause of the 
“damage, if any, in question.”  Neither the negligence question nor any 
other questions the jury was required to answer contained a damages instruction.[14]
        At 
trial, the jury heard evidence of two types of damage: damage caused by the hail 
storm and damage caused by Wright’s botched repair job.  The jury learned 
that the hail-damaged roof had been replaced and that Harris received insurance 
proceeds to cover the cost of the replacement roof.  From this, a rational 
trier of fact could have concluded that Harris did not have any outstanding 
damage from the hail storm.
        The 
evidence showed that the roof’s current condition was attributable to 
Wright’s repair job. Expert testimony established that the replacement roof 
was failing, at least in part because Wright failed to install a recovery board.  
The repair bid from Boyd, upon which the hail damage claim settlement was based, 
called for the installation of a recovery board. Insurer testimony established 
that although Aetna inspected the roof for completion before issuing its final 
replacement cost payment, either Harris or the lienholder, not the insurer, was 
responsible for making sure the repairs were done correctly.  Moreover, 
Harris admitted that he paid Wright approximately $315,000 less than the amount 
he represented to Aetna.  Although there was testimony that the cost of 
installing a recovery board would not have significantly impacted the cost of 
repairing the roof, the jury could have reasonably inferred that a $375,000 roof 
was inferior in quality to a $690,000 roof.  Therefore, we hold that the 
jury’s finding that Harris’s negligence caused “the damages in question” 
is not against the great weight and preponderance of the evidence.
        In 
any event, the negligence finding had no bearing on the verdict.  A jury 
finding that Harris’s negligence did not cause the damages would not affect 
his recovery because the jury failed to assign any proportion of the liability 
for damages to American, and we have already held that the jury’s findings in 
favor of American are not against the great weight and preponderance of the 
evidence.
Fraud Counterclaim
        Finally, 
we turn to American’s sole issue on appeal, that the trial court erred in 
granting a directed verdict against American on its counterclaim for fraud.  
American contends that its fraud claim was filed within the applicable statute 
of limitations and is not barred by the holding in Ernst & Young v. 
Pacific Mutual Life Insurance Co., 51 S.W.3d 573 (Tex. 2001).
        A 
directed verdict is proper only under limited circumstances: (1) when the 
evidence conclusively establishes the right of a movant to judgment or negates 
the right of an opponent; or (2) when the evidence is insufficient to raise a 
material fact issue. See Prudential Ins. Co. v. Fin. Review Svcs., Inc., 
29 S.W.3d 74, 77 (Tex. 2000); Ray v. McFarland, 97 S.W.3d 728, 730 (Tex. 
App.—Fort Worth 2003, no pet.); see also Tex. R. Civ. P. 268.  In reviewing 
a directed verdict, we must review the evidence in the light most favorable to 
the party against whom the verdict was rendered. Szczepanik v. First S. Trust 
Co., 883 S.W.2d 648, 649 (Tex. 1994).  When reviewing a directed 
verdict on a legal issue, we consider all the evidence presented at trial, 
viewing it in the losing party’s favor “as much as the record allows.”  
S.V. v. R.V., 933 S.W.2d 1, 8 (Tex. 1996).
        A 
party moving for directed verdict on the ground that the claim asserted is 
barred by limitations must conclusively prove when the cause of action accrued 
and the applicable statute of limitations.  KPMG Peat Marwick v. 
Harrison County Hous. Fin. Corp., 988 S.W.2d 746, 748 (Tex.1999).  When 
the discovery rule applies and has been raised by the nonmovant, as in this 
case, the movant must negate the discovery rule by proving as a matter of law 
that there is no genuine issue of fact about when the plaintiff discovered or 
should have discovered the nature of the injury.  Tex. R. Civ. P. 166a(c); Burns v. 
Thomas, 786 S.W.2d 266, 267 (Tex. 1990); Prostok v. Browning, 112 
S.W.3d 876, 897 (Tex. App.—Dallas 2003, pet. granted).
        The 
statute of limitations for fraud is four years.  Tex. Civ. Prac. & Rem. Code Ann. § 
16.004(4).  Unlike other causes of action, limitations do not begin to 
accrue on fraud claims until the plaintiff discovers, or in the exercise of 
reasonable care and diligence should have discovered, the fraud.  Quinn 
v. Press, 140 S.W.2d 438, 440 (Tex. 1940); Computer Assocs. Int’l, Inc. 
v. Altai, 918 S.W.2d 453, 455-56 (Tex. 1996).  Because American filed 
its counterclaim for fraud on November 12, 2001, it is barred by the statute of 
limitations only if Harris proved that American discovered or should have 
discovered the fraud before November 11, 1997.
        Considering 
the evidence in the light most favorable to American, the record shows that 
Harris represented the cost of roof repairs as $690,000 to Aetna on February 22, 
April 1, and June 24, 1996.  When American paid Aetna its half of the 
replacement cost, it relied on the payment requests that Harris gave Aetna and 
did not have any direct involvement with Harris.  After Harris filed suit 
against American in August 1997, American requested “all bills, invoices, 
bids, proposals, receipts, statements or cancelled checks reflecting any 
charges, expenses, costs, fees, expenditures, payments or other disbursements 
you claim to have incurred or which reflect the damages which form the basis of 
this lawsuit.”  As of August 18, 1998, approximately nine months after 
the date Harris contends American should have discovered the fraud, Harris 
continued to withhold documents reflecting the true cost of the roof repairs.  
This fact raises a serious doubt about American’s ability to discover the 
fraud before the date in question. American ultimately discovered the fraud July 
17, 2000, when Mike Wright gave deposition testimony that he contracted with 
Harris to repair the roof for $375,000.  Because American filed its fraud 
claim within four years of learning that Harris had misrepresented the cost of 
the roof repairs and Harris did not conclusively prove that American should have 
discovered Harris’s misrepresentations before November 11, 1997, we hold that 
Harris did not meet his burden of showing that American’s fraud claim is 
barred by the statute of limitations.
        Although 
the trial court granted the directed verdict against American on statute of 
limitations grounds, we turn to Harris’s argument that American’s fraud 
claim is barred by the holding in Ernst & Young because we must 
affirm the directed verdict, even though the trial court’s rationale was 
erroneous, if the directed verdict can be supported on another basis.  Cano 
v. N. Tex. Nephrology Assocs., P.A., 99 S.W.3d 330, 339 (Tex. App.—Fort 
Worth 2003, no pet.).
        In 
Ernst & Young,[15] the supreme court set 
forth the following test for a fraudfeasor’s liability to third parties:  
One who makes a fraudulent misrepresentation is subject to liability to the 
persons or class of persons whom he intends or has reason to expect to act or to 
refrain from action in reliance upon the misrepresentation, for pecuniary loss 
suffered by them through their justifiable reliance in the type of transaction 
in which he intends or has reason to expect their conduct to be influenced.  
51 S.W.3d at 578.  Even an obvious risk that a misrepresentation might be 
repeated to a third party is not enough to satisfy the reason-to-expect 
standard; rather, the alleged fraudfeasor must “have information that would 
lead a reasonable [person] to conclude that there is an especial likelihood that 
it will reach those persons and will influence their conduct.”  Id. at 
580.  Further, mere foreseeability will not meet the reason-to-expect 
standard; instead, the claimant’s reliance must be “especially likely” and 
justifiable, and the transaction sued upon must be the type the defendant 
contemplated.  Id.
        Harris 
will not be held liable to American unless American is an entity that he 
intended or had reason to expect to pay the hail damage claim.  At the time 
he made the misrepresentations, Harris did not know about the American insurance 
policy.  Therefore, he did not have information that would lead a 
reasonable person to conclude that there was an especial likelihood that his 
misrepresentations would reach any insurer other than Aetna.  To the 
contrary, Harris had every reason to believe that Aetna was the sole insurer 
liable for the hail damage claim.  The building’s previous owner filed 
the hail damage claim with Aetna and purposely withheld information about 
American’s liability from Harris.  Aetna gave Harris documentation 
verifying that it was paying one hundred percent of the claim and Harris did, in 
fact, receive the hail damage claim benefits from Aetna.  Because the 
record contains no evidence that Harris could foresee that American’s, or any 
other insurer’s besides Aetna’s, reliance on his misrepresentation was 
especially likely, we overrule American’s sole issue.  Having overruled 
all of Harris’s and American’s issues, we affirm the trial court’s 
judgment.
  
                                                                  JOHN 
CAYCE
                                                                  CHIEF 
JUSTICE
 
 
PANEL 
A:   CAYCE, C.J.; DAUPHINOT and GARDNER, JJ.
 
DELIVERED: 
February 10, 2005

 
NOTES
1.  
The Aetna policy was pro rata, and the American policy expressly covered fifty 
percent of the property loss.
2.  
This amount included both roof and skylight damage.
3.  
The 21.55 claim was not submitted to the jury because the court conditionally 
granted Harris’s motion for a directed verdict on that issue.  The court 
indicated that it would grant the motion if the jury found Harris’s insurance 
claims to be valid, which it did not.
4.  
The actual amount of American’s liability for the hail damage claim was 
reached by adding fifty percent of the ACV and fifty percent of the true 
replacement cost, minus the deductible and ACV, as shown below:
        $268,000 
(ACV) x .5 = $134,000
        $375,000 
(cost of repairs) - 25,000 (deductible)
        - 
268,000  (ACV) = $82,000
        $82,000 
x .5 = $41,000
        $134,000+41,000= 
$175,000.
5.  
Because the hail damage claim was indisputably covered by the American policy, 
we sustain that part of Harris’s first issue.
6.  
Aetna was unaware of the American policy when it agreed to cover one hundred 
percent of the hail damage loss.
7.  
Harris submitted the following breach of contract questions:
 
1) Did Defendant American Protection Insurance Company breach its insurance 
policy in its efforts adjusting, or failing to adjust, Mr. Harris’[s] 
insurance claims?
2) 
Was such breach of its insurance policy a producing cause of damages to Mr. 
Harris and, if so, find the amount of such damages.

8.  
The pertinent sections of article 21.55 require an insurer to acknowledge 
receipt of a claim in writing, commence an investigation, request “items, 
statements and forms from the insured” fifteen days after the insurer receives 
notice of a claim, and pay a claim within sixty days of receiving the requested 
“items, statements and forms.”  Tex. 
Ins. Code Ann. art. 21.55, §§ 2, 3(f) (Vernon Supp. 2004-05).
9.  
This statutory standard is identical to the common law bad faith standard.  
Mid-Century Ins. Co. of Tex. v. Boyte, 80 S.W.3d 546, 549 (Tex. 2002); Giles, 
950 S.W.2d 48, 55 (Tex. 1997).
10.  
Because Harris did not prove that the supplemental claim was covered by the 
American policy, we overrule that part of his first issue.
11.  
Section C, Paragraph 4 of the policy provided as follows: “This policy does 
not insure against loss or damage caused by or resulting from: faulty 
workmanship, material, construction or design . . . or work being performed upon 
property and directly attributable thereto; except ensuing loss from a peril not 
otherwise excluded by this policy.”
12.  
Section D, Paragraph 27 of the policy provided as follows:  “This company 
shall not be liable for loss occurring while a described building . . . is 
vacant or unoccupied beyond a period of sixty consecutive days unless existing 
fire protection, watch and alarm services are maintained and written notice is 
given to the company prior to the sixtieth consecutive day of cessation, vacancy 
or unoccupancy.”
13.  
The expiration date on the American policy in the record is August 5, 1996.  
The supplemental claim was made the following February.
14.  
Questions 2, 5, 7, and 11 instructed the jury to consider “the following 
element of damages and no other”: “reasonable and necessary costs to repair 
the roof and skylights from damages arising from the May 5, 1995 hailstorm”; 
however, the jury’s answers to corresponding liability questions precluded it 
from answering those questions.  Although Question 12 asked the jury to 
find “the reasonable and necessary cost(s) of repairing the roof and skylights 
. . . . for damage, if any, arising from the May 5, 1995 hailstorm,” it failed 
to connect that measure of damages with the negligence question.
15.  
In Ernst & Young, an investor alleged that an accounting firm 
knowingly or recklessly materially misrepresented the financial health of a bank 
and intended investors to rely on the misrepresentation, and that the investor 
actually and justifiably relied on the misrepresentation when it bought notes 
from a bank with which the audited bank was about to merge.  The supreme 
court held that the accounting firm established as a matter of law that it had 
no reason to expect the investor’s reliance on the audit report in the 
transaction at issue.  Ernst & Young, L.L.P., 51 S.W.3d 
at 582.